IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CURTIS LEVEL CHAPMAN | | |
| Petitioner, | No. 2:12-cv-0912 KJM DAD P | |
| vs. | | |
| RON BARES, | | |
| Respondent. | FINDINGS & RECOMMENDATIONS | |
| _____/ | | |

      Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges a judgment of conviction entered against him on November 16, 2009 in the Sacramento County Superior Court on charges of special circumstance murder and robbery. He seeks federal habeas relief on the grounds that the trial court's erroneous exclusion of evidence violated his right to due process. Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

/////
/////
/////
/////

1

**I. Background**

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal[1], the California Court of Appeal for the Third Appellate District provided the following factual summary:

> Following a joint trial, separate juries convicted defendants Richard Antonio Hundley and Curtis Level Chapman of the first degree murder of David Barreda (Pen. Code, § 187, subd. (a))[2] and found that the murder was committed while defendants were engaged in the commission of a robbery (§ 190.2, subd. (a)(17)(A)). Chapman's jury also found he used a firearm to commit the murder. (§ 12022.53, subd .(d)). Defendants were sentenced to life in prison without the possibility of parole for Barreda's murder, and Chapman was sentenced to a consecutive term of 25 years to life for the firearm enhancement. Among other things, the trial court ordered each defendant to pay a $10,000 parole revocation restitution fine (§ 1202.45) and a $30 court facilities assessment (Gov. Code, § 70373). It refused to award either defendant presentence custody credit for the time they spent in actual custody prior to being sentenced. Defendants appeal.[3]
>
> Hundley contends insufficient evidence supports his first degree murder conviction, the trial court prejudicially erred in allowing Chapman's counsel "to delve into the facts" underlying Hundley's prior felony conviction and in admitting evidence of Chapman's out-of-court statements implicating Hundley. He also asserts that imposition of the $30 court facilities assessment violated state and federal prohibitions against ex post facto laws. We shall conclude sufficient evidence supports Hundley's murder conviction, and the trial court did not abuse its discretion in allowing Chapman's counsel to question Hundley about his prior conviction or in admitting evidence of Chapman's out-of-court statements implicating Hundley. We shall further conclude the trial court did not err in imposing the court facilities assessment.
>
> Chapman claims the trial court prejudicially erred in refusing to admit evidence that the individuals who threatened a key prosecution witness were gang members. We shall conclude any error in excluding such evidence was harmless.

---

[1] Doc. No. 12-1 (hereinafter Opinion).

[2] Further undesignated statutory references are to the Penal Code.

[3] On our own motion, we consolidated both appeals for purposes of oral argument and decision only.

Both defendants argue, and the People concede, the trial court erred in ordering them to pay a parole revocation fine and in refusing to award them any presentence custody credit for the actual time they spent in custody prior to sentencing. We shall conclude the trial court erred in imposing the parole revocation fines, order that those fines be stricken, and affirm the judgments as modified. We shall decline to modify the judgments to include an award of presentence custody credit given that defendants were sentenced to life in prison without the possibility of parole.

FACTUAL AND PROCEDURAL BACKGROUND

I

**The Prosecution**

Barreda, the victim, met Desiree Santillan at a car show in 2008, and the two began communicating over the internet. Eventually, they arranged to meet at Desiree's home on the evening of November 24, 2008. Desiree, who was 18 years old at the time, lived with her stepmother Heather Santillan, Heather's boyfriend Chapman,[4] Heather's three young sons, Tammy Turney, and Turney's son Hundley.[5]

Barreda arrived at Desiree's home late in the afternoon. He and Desiree sat at the dining room table talking, while Chapman and Hundley played video games in the living room, and Heather remained in her room. Eventually, Barreda began talking to Chapman and Hundley. Barreda "bragged" about his cars, motorcycles, guns, and access to drugs. He said that "he had a lot of different kinds of guns if anybody was looking to buy some" and pulled a gun out of his pants and showed it to Chapman and Hundley. Desiree told Barreda she was uncomfortable with him having a gun in the house. Barreda gave the gun to her, and she placed it in the trunk of Heather's car. Desiree later returned the gun to Barreda.

At some point, Turney, who had heard Barreda talking, decided to "rob" him. She took Barreda's keys and directed Hundley to go through Barreda's car and steal anything of value. Hundley did so but did not find anything except two CDs. Hundley returned the keys to Turney, and Turney put them in her pocket and went to bed.

/////

---

[4] Heather married Chapman while he was in custody following his arrest in this case.

[5] We shall refer to Heather, Desiree, and Heather's son Anthony by their first names to avoid confusion. No disrespect is intended.

3

Later, when Barreda attempted to leave, he could not find his keys. He telephoned a few locksmiths, but none came. Eventually, Desiree said he could sleep on the couch, which he did.

Sometime after Hundley searched Barreda's car, Chapman told Hundley, Barreda's "gotta go, I'm gonna smack him." "Smack" is slang for "kill." Hundley responded, "Don't kill him, just rob him regular, put your gun to his head and take his property."

The following morning Desiree helped her younger brothers get ready for school, and at approximately 8:00 a.m., she and Heather left to walk them to school. Meanwhile, Chapman, Hundley and Barreda spoke in the kitchen. Chapman, who was armed with a gun, told Barreda it was "disrespectful" for him to have a gun in the house and demanded Barreda give him his gun, which he had in his lap. Chapman and Hundley told Barreda "we're going to take your shit." A dispute followed, and Chapman shot Barreda in the back of the head.

Chapman and Hundley dragged Barreda's body from the kitchen to the garage, placed it in the trunk of Barreda's car, and drove Barreda's car to a nearby location.

Heather and Desiree returned to the house at approximately 8:30 a.m. and saw that Barreda's car was gone. As they walked inside, Heather smelled smoke and saw a broken lamp in the kitchen and Desiree's purse thrown in front of the refrigerator. Desiree attempted to call and text Barreda but got no response. Turney was the only one home, and she was acting "pretty hyper." She told Heather that she needed to talk to her outside. Once outside, Turney told Heather Barreda was dead, and they had his gun. While they were talking, Chapman and Hundley walked up to the house. Chapman had blood on his t-shirt, and Hundley had blood by his knee and on his shoe. When Heather noticed "smudges" of blood in the garage, she attempted to clean them with bleach.

The next day, November 26, 2008, Barreda's body was discovered inside the trunk of his car. He died from a single gunshot to the back of his head. He was shot with either a .38 special or .357 magnum caliber bullet.

Detectives with the Sacramento County Sheriff's Department began investigating Barreda's death. They obtained Barreda's cell phone records and began cold calling recently dialed phone numbers. On December 1, 2008, a detective dialed a number, and Desiree answered. She indicated she knew Barreda and that she lived at an address that was approximately one mile from where Barreda's body was found. She agreed to meet with the detective at his office the following day, December 2, 2008. Based on information gleaned during that interview, detectives contacted

/////

4

Heather for an interview. Heather was interviewed later that day and into the next.

When interviewed by law enforcement, Chapman initially denied knowing why the detective wanted to speak to him. Later, he admitted helping dispose of Barreda's body but maintained that Hundley killed Barreda "[t]o rob him of his belongings." Finally, when asked directly whether he was "the shooter," Chapman nodded his head in the affirmative. Thereafter, he told detectives that he wrapped Barreda's gun in a red towel and disposed of it in a nearby backyard. A detective searched the area described by Chapman but was unable to locate the gun. He did find a red towel and a Carl's Jr. bag containing a box of Remington .38 special ammunition.

At trial, both Desiree and Heather testified under grants of immunity. Desiree admitted that before she was interviewed on December 2, 2008, Heather told her to say that they were cousins, and that nobody was living at Heather's house except Desiree, Heather, and Heather's sons. She also conceded that Turney told her not to mention Turney to the detective. Desiree initially complied with Heather and Turney's instructions and lied about what happened. Later, she decided to stop lying and told the truth about what happened in the hours before Barreda's murder.

Heather admitted prior felony convictions for welfare fraud and passing bad checks. As to the instant case, she admitted pleading guilty to illegally purchasing ammunition[6] and to being an accessory after the fact. She acknowledged that as a result of her deal with the prosecution to testify truthfully in this matter and at Turney's trial, she was sentenced to one year in jail for those crimes and a probation violation. She also conceded that while this case was pending, she was arrested for petty theft and falsely stated she was in protective custody at that time.

Heather also explained that she initially lied to law enforcement to protect herself, her children, and everyone involved. She described how Turney had threatened to kill her and her children if she mentioned Turney or Hundley to detectives and how she feared Turney because Turney had told her she "had been involved in violence before" that "involved individuals being seriously hurt or killed." When first interviewed by law enforcement on December 2 and 3, 2008, she never stated that Chapman admitted shooting Barreda. She stated that Chapman told her "they did it" and that his family's gun was used to shoot Barreda. Heather conveyed so much fear to the detectives about what might happen to her or her

---

[6] At Chapman'' request, Heather purchased two boxes of Remington .38 caliber bullets 11 days before Barreda's murder. In doing so, she filled out a form and checked a box indicating she had not previously been convicted of a felony.

5

children as a result of what she said during the interview that she and her children were placed into protective custody. In February 2009, she was attacked and told she "better not tell on [Turney] and [Hundley]" and "better put the blame on [Chapman]."

Heather was interviewed a second time on December 10, 2008. During that interview, she stated that Chapman admitted shooting Barreda. She acknowledged that between her first and second interview, she learned that the mother of Chapman's child had been visiting him in jail. She also acknowledged that this made her angry because she did not know Chapman was still seeing the woman.

Both Heather and her 11 year-old son Anthony testified that Chapman told them he was the shooter. Anthony initially testified that Chapman told him he accidentally shot Chapman [sic]. More particularly, Chapman told Anthony "[t]hat [Turney] and [Hundley] were planning to jack [Barreda] . . . [a]nd that the guy was just sitting there, but then the guy knew that something was happening. [¶] And then he pulled out his gun, and [Chapman] was just coming out of the room, and he got squared, then he shot him because he was frightened he might be shot." Later, Anthony testified that Chapman told him that Hundley "was distracting [Barreda], and [Chapman] swung over and shot him in the head." When Chapman's counsel observed during cross-examination that Anthony's testimony "about [Hundley] distracting and [Chapman] shooting . . . [was] different than what you said that [Chapman] told you before about what happened," Anthony stated that his subsequent testimony was "real." He explained that "[t]he other one I thought, but now everything is coming clear." Anthony was surreptitiously videotaped at the sheriff's station telling Heather that Chapman "said [Hundley] was distracting [Barreda], and [Chapman] swang [sic] over and shot the guy in the head."

Heather also testified that Hundley himself told her that he was "[t]alking with [Barreda], almost like distracting him" when Chapman shot Barreda.[7]

II

**The Defense**

Chapman did not testify at trial.

Hundley testified in his own defense as follows: He was outside having a cigarette when Barreda arrived. Barreda went inside with Desiree, and Hundley went to his room. He came out about 30

---

[7] Turney was charged along with defendants with Barreda'' murder. On July 28, 2009, the trial court granted the People's motion to sever her trial from that of defendants.

6

minutes later, and saw Turney, Chapman, Desiree, and Barreda drinking and talking.  At some point, Barreda and Desiree left to go to the store.   While they were gone, Heather told Chapman and Hundley that Desiree had hidden a gun for Barreda somewhere in the house, and Turney said "they could steal it."  The plan was for Hundley to be the "look-out" while Turney and Chapman looked for the gun.  They did not find the gun before Desiree and Barreda returned, and Desiree, Barreda, and Turney resumed drinking.  At some point, Barreda asked Desiree for his gun in front of everyone, and Desiree went to the garage, retrieved the gun, and handed it to him.  Barreda showed the gun to everyone and asked, "you guys know anybody who wants to buy guns[?]  I get guns and I sell them."  Hundley said he would like to buy a gun, but he did not have any money.  As Chapman looked at the gun, Barreda continued to "go on and on" about guns and told them he had "a 40 caliber with a laser" in his car.

Later, Turney told Hundley and Chapman that Barreda was "slipping" and suggested that she grab his keys and that Hundley or Chapman search his car for the gun with the laser.  They agreed, and when Barreda was not looking, Turney took his keys and gave them to Hundley, who searched Barreda's car.  He found a couple of compact discs, which he took, but nothing else.  He returned to the house, placed Barreda's keys on a table, and went into his room.

About 10 minutes later, Chapman entered Hundley's room and told him he was going to "smack" Barreda for his gun.  Hundley told Chapman "that's stupid" and there was "no reason" for him to kill Barreda.  He advised Chapman that "if you plan on robbing him, just . . . put [your] gun in his face and just take the gun off him."  Hundley explained the gun was probably stolen, and thus, it was unlikely Barreda would call the police and report the robbery.  At that point, Chapman said "he was done" and "would forget about it."  Hundley thought that was the end of it; he never agreed to Chapman's plan to rob and kill Barreda or to share the gun or the profits from the sale of the gun.

The next morning, Hundley went to the kitchen to heat up some coffee, and Barreda sat down at the kitchen table and began talking to him.  As Hundley turned away from Barreda, he heard a "boom."  When he turned back around, he saw Barreda hit the floor.  Hundley asked Chapman, "what the fuck is wrong with you [?]"  Chapman ignored Hundley and went through Barreda's pockets.  Chapman took Barreda's gun from Barreda's waistband, put it on the table, and told Hundley, "it's me  sic] and yours."  When Turney entered the kitchen, Chapman began barking orders.  Hundley initially refused to assist him, but ultimately helped get rid of Barreda's body because he wanted it out of the house as soon as possible.

/////

7

> During cross-examination, Hundley conceded that he failed to say anything about not wanting Chapman to rob Barreda when he was interviewed by law enforcement. Rather, he told the police that Chapman "wasn't supposed to kill him, he was just supposed to rob him . . . ." Hundley also admitted having a prior conviction for possessing crack cocaine for sale. (Health & Saf. Code, § 11351.5.) Additional relevant facts are set forth below.

(Opinion at 4-14.)

**II. Analysis**

  **A. Standards of Review Applicable to Habeas Corpus Claims**

  An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

  Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

  For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the state court decision. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Nonetheless, "circuit court precedent may be persuasive in determining what law is

8

clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[8] Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 412. See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S.___,___,131 S. Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter,131 S. Ct. at 786-87.

---

[8] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 131 S. Ct. at 784-85. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." Richter, 131 S. Ct. at 784.

/////

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).[9]

### B. Petitioner's Claims

Petitioner raises four claims for federal habeas relief. In his first claim, he argues that, "in light of the fact that there were separate juries," the trial court erred in excluding evidence that the persons who threatened Heather and told her to give testimony that implicated petitioner in the murder and excluded Hundley and Turney from any involvement in the murder were members of a gang. (Doc. No. 1 (Pet.) at 4.) In his second claim for relief, petitioner argues that the trial court's error in excluding this gang-related evidence was prejudicial. (Id.) In his third claim for relief, petitioner argues that Heather's testimony was crucial to the success of the prosecution, and he notes that she changed her version of the murder from the time of her initial police interrogation to her second police interrogation. (Id. at 5.) In his fourth claim for relief, petitioner argues that his case was close, as evidenced by the fact that the jury asked for several read-backs of trial testimony, and the trial judge was required to issue a jury instruction "urging the jury to reach agreement" after they initially announced a deadlock. (Id.) This court construes each of petitioner's separate claims and arguments in support thereof to constitute, in reality, a single claim that the trial court violated petitioner's right to due process when it

/////
/////
/////

---

[9] The United States Supreme Court has recently granted certiorari in a case apparently to consider this issue. See Williams v. Cavazos, 646 F.3d 626, 639-41 (9th Cir. 2011), cert. granted in part, ___U.S.___, 132 S. Ct. 1088 (2012).

11

excluded relevant evidence that would have impeached Heather's credibility.[10]

### 1. State Court Opinion

The California Court of Appeal rejected all of petitioner's arguments described above. In doing so the state appellate court reasoned as follows:

> **Any Error In Excluding Evidence That The Individuals Who Threatened Heather Were Gang Members Was Harmless**
>
> Chapman contends the trial court abused its discretion in excluding evidence that the individuals who threatened Heather "to inculpate Chapman and exculpate . . . Hundley and Turney" were gang members. Chapman asserts that such evidence was probative because "a jury could conclude that a threat made by an organized and violent criminal street gang is much more likely to sway the witness than blustering by an incarcerated codefendant or her relatives," and any prejudice to Hundley could have been avoided by excluding his jury during the presentation of such evidence. Chapman further asserts that "[t]he error was prejudicial [as to his murder conviction and the jury's findings on the special circumstance and firearm allegations] notwithstanding the fact that the jury heard other evidence impeaching Heather's credibility, for the threats by the gang were far more powerful than Heather's other motives to lie." We need not determine whether the trial court abused its discretion in excluding the gang evidence because, as we shall explain, any such error was harmless.
>
> Chapman moved in limine to introduce evidence that Heather "changed her story" to inculpate him in part because she had been threatened by gang members associated with Hundley, Turney and Turney's ex-husband Eric Bell. In addition, Chapman sought to have a gang expert testify about "the culture of gangs, the violent nature of gangs, [and] the disdain for snitches in gangs."
>
> At an evidentiary hearing conducted pursuant to Evidence Code section 402, Heather testified as follows: before she was interviewed by law enforcement in connection with this case, Turney told her that she better say that Chapman was the person who shot Barreda and not place any blame on Turney or Hundley. When first interviewed by law enforcement, Heather lied and denied knowing anything about the case, including anyone dying in her home or anyone's involvement in Barreda's death. After law

---

[10] In support of his claim four argument that his case was a close one, petitioner asserts that "the jurors would not have come to agreement if the court did not give them new instruction." (Id.) The court does not construe this argument as a claim brought pursuant to Allen v. United States, 164 U.S. 492 (1896), and will therefore not address it as such. In any event, no Allen based claim was properly exhausted by petitioner in state court.

12

enforcement promised to protect her, however, she told the truth about what had happened, including that Chapman was the shooter.

Thereafter, she was told by someone in South Sacramento that Eric Bell, Turney's "supposed ex-husband," wanted to "get his hands on [her]." She assumed that Bell wanted her to "take[ ] any blame off of [Turney] and possibly her son [Hundley]." While Bell never "got at" her, others did. On three occasions people made it "very clear as to what the outcome w[ould] be" if she did not "take all the blame off" of Turney and Hundley "and put it on" Chapman. On one of those occasions a man with dread locks slapped her, told her he was going to rape her, ripped her shirt and pants, "robbed the jewelry off [her] neck," told her "things happen to snitches," and said that if she did not "point everything on to [Chapman]" she would "get it." Heather admitted telling law enforcement that Chapman was the one responsible for the homicide but denied doing so because of the threats she received.

Following the hearing, the trial court ruled that everything Heather testified to was admissible but evidence the individuals who threatened her were gang members was not, noting, among other things, that it "didn't hear anything about gangs."

"Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court." (People v. Burgener (2003) 29 Cal.4th 833, 869.) In other words, a jury is entitled to evaluate a witness's testimony knowing it was given under circumstances that might engender retaliation. "And they would be entitled to know not just that the witness was afraid, but also, within the limits of Evidence Code section 352, those facts which would enable them to evaluate the witness's fear. A witness who expresses fear of testifying because he is afraid of being shunned by a rich uncle who disapproves of lawyers would have to be evaluated quite differently than one whose fear of testifying is based upon bullets having been fired into her house the night before the trial." (People v. Olguin (1994) 31 Cal. App.4th 1355, 1369.)

Chapman claims the trial court prejudicially erred in refusing to admit evidence that Heather "was aware that the threats were from gang members." Like the trial court, we question the probative value of such evidence insofar as Chapman failed to make any showing that that (sic) Heather knew the individuals who threatened her were gang members. Absent such a showing, Chapman could not establish their gang membership had any impact whatsoever on Heather. Chapman acknowledges "Heather had not in fact testified to any gang involvement" but asserts that "the [trial] court understood the offer of proof to be that Hundley

13

and Bell were involved in the same gang, and hence the jury could infer that Bell was making his threats on behalf of the gang." Again, even if true, Chapman made no showing Heather knew that Bell or any of the other individuals who threatened her were gang members. In any case, we need not decide whether the trial court abused its discretion in excluding such evidence because any error was harmless.

We review the assumed evidentiary error under People v. Watson, supra, 46 Cal.2d at page 836 (whether "'it is reasonably probable that a result more favorable to [Chapman] would have been reached in the absence of the error.'")[11]

At trial, evidence was presented that Heather feared Turney and would have taken her threats seriously. Turney threatened to hurt or kill Heather and her children if Heather did not exculpate Turney and Hundley and implicate Chapman. Heather believed Turney would make good on her threats because Turney told Heather she "had been involved in violence before" that "involved individuals being seriously hurt or killed." Indeed, Heather conveyed so much fear during the interview that law enforcement placed her and her children into protective custody.

Moreover, contrary to Chapman's assertion, Heather did implicate Chapman in Barreda's murder during her first interview with law enforcement. While she did not state that Chapman admitted shooting Barreda, she did say that he told her that "they did it" and that his family's gun was used to shoot Barreda.

Finally, Heather was not the only witness to implicate Chapman in Barreda's murder. Anthony testified that shortly after the murder Chapman told him he shot Barreda. Anthony was surreptitiously recorded telling Heather the same thing while the two were alone in an interview room. Perhaps most significantly, when asked directly if he was the shooter, Chapman nodded his head in the affirmative. A videotape of Chapman's confession was played for the jury.

---

[11] Chapman contends in conclusory terms that the prejudice from the exclusion of the gang evidence must be assessed by the standard for federal constitutional error, namely whether the error was harmless beyond a reasonable doubt. (Chapman v. California (1967) 386 U.S. 18, 23–24 [17 L.Ed.2d 705, 710–711].) We reject Chapman's attempt "to inflate garden-variety evidentiary questions into constitutional ones." (People v. Boyette (2002) 29 Cal.4th 381, 427.) "[O]nly evidentiary error amounting to a complete preclusion of a defense violates a defendant's federal constitutional right to present a defense." (People v. Bacon (2010) 50 Cal.4th 1082, 1104, fn. 4; see also People v. Boyette, supra, 29 Cal.4th at pp. 427–428.) The exclusion of the gang evidence did not preclude a defense. Chapman also asserts the error violated his right to a trial by jury but fails to explain why this is so. Accordingly, we need not address the assertion. (See People v. Freeman (1994) 8 Cal.4th 450, 482, fn. 2 [a reviewing court need not discuss claims that are asserted perfunctorily and insufficiently developed].)

14

> On this record, it is not reasonably probable that a result more favorable to Chapman would have been reached had the jury also learned that the individuals who threatened Heather were gang members.

(Opinion at 25-30.)

### 2. Applicable Legal Standards and Analysis

As set forth above, the California Court of Appeal did not decide whether the trial court abused its discretion in excluding evidence that the people who threatened Heather were gang members, concluding instead that any possible error in this regard was harmless. This court agrees that, even assuming arguendo the trial erred under state law in excluding evidence that the persons who threatened Heather were members of a gang, any such error was harmless.

On collateral review of a state court criminal judgment under 28 U.S.C. § 2254, an error is harmless unless it had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 631 (1993). The United States Supreme Court has clarified that "in § 2254 proceedings a federal court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht . . ., whether or not the state appellate court recognized the error and reviewed it for harmlessness . . . ." Fry v. Pliler, 551 U.S. 112, 121-22 (2007). "When a state court has found a constitutional error to be harmless beyond a reasonable doubt, a federal court may not grant habeas relief unless the state court's determination is objectively unreasonable." Towery v. Schriro, 641 F.3d 300, 307 (9th Cir. 2010). Further, a state court's decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding." Cooper v. Brown, 510 F.3d 870, 921 (9th Cir. 2007) (citations omitted).

In this case, the California Court of Appeal concluded that any evidentiary error in the trial court's excluding evidence that the persons who threatened Heather were gang members was harmless because: (1) there was evidence before the jury that Heather was afraid of Turney

15

and would have taken her threats seriously; (2) Heather implicated petitioner in the murder during her first police interview, before any threats occurred; (3) other witnesses implicated petitioner in the murder; and (4) petitioner himself nodded his head in the affirmative when asked if he was the shooter, thereby confessing. (Opinion at 29-30.) This court agrees with the state appellate court that, under these circumstances, the trial court's evidentiary error, if any, in excluding the gang-related evidence was harmless.

Viewing the trial record as a whole, and for the reasons expressed by the California Court of Appeal, it is reasonable to conclude that any error by the trial court in excluding evidence that gang members threatened Heather in order to induce her to implicate petitioner in the commission of the murder could not have had a substantial or injurious effect on the verdict in this case, including the jury's findings with respect to the sentence enhancement and special circumstance allegations. Certainly the decision of the California Court of Appeal is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter,131 S. Ct. at 786-87. Accordingly, petitioner is not entitled to federal habeas relief.

## III. Conclusion

For the reasons set forth above, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

1991). In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: January 31, 2013.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:8:
chapman912.hc